IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

REBECCA SUMMERS,

     Plaintiff,

vs.                                                      2:14-cv-00936-KG-LF

SOCIAL SECURITY ADMINISTRATION,
CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

     Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court on plaintiff Rebecca Summers' Motion to

Reverse or Remand Administrative Agency Decision (Doc. 24), which was fully briefed

September 2, 2015.  Pursuant to 28 U.S.C. § 636, this matter has been referred to me for a

recommended disposition.  Doc. 33.  Having carefully reviewed the parties' submissions and the

administrative record, I recommend that the Court grant Ms. Summers' Motion to Remand.

### I.     Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final

decision[1] is supported by substantial evidence and whether the correct legal standards were

applied.  *Maes v. Astrue,* 522 F.3d 1093, 1096 (10th Cir. 2008).  If substantial evidence supports

the Commissioner's factual findings and the correct legal standards were applied, the

Commissioner's decision stands, and the plaintiff is not entitled to relief.  *Langley v. Barnhart,*

373 F.3d 1116, 1118 (10th Cir. 2004).  The Court must meticulously review the entire record,

---

[1] The Court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, 20 C.F.R. §§ 404.981, 416.1481, as it is in this case.

but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley,* 373 F.3d at 1118. "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). While the Court may not reweigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart,* 399 F.3d 1257, 1262 (10th Cir. 2005). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence.'" *Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

"If, however, the correct legal test in weighing the evidence has not been applied, these limitations do not apply, and such failure constitutes grounds for reversal." *Casias v. Sec'y of Health & Human Servs*., 933 F.2d 799, 801 (10th Cir. 1991) (citations omitted). This Court may reverse or remand if the ALJ failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996) (citation omitted); *see also Jensen v. Barnhart,* 436 F.3d 1163, 1165 (10th Cir. 2005).

An ALJ's error is harmless only "where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in another way." *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). However, for this Court to find harmless error

2

based "on legal or evidentiary matters not considered by the ALJ" runs the risk of violating the rules against post hoc justification of the administrative decision.  *Id.*

## II.      Applicable Law and Sequential Evaluation Process

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show:  (1) the claimant is not engaged in "substantial gainful activity;" (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) the impairment(s) either meet or equal one of the Listings[2] of presumptively disabling impairments; *or* (4) the claimant is unable to perform his or her "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261–62.  If the claimant cannot show that his or her impairment meets or equals a Listing but proves that he or she is unable to perform his or her "past relevant work," the burden of proof shifts to the Commissioner, at step five, to show that the claimant is able to perform

---

[2] 20 C.F.R. pt. 404, subpt. P, app. 1.

other work in the national economy, considering the claimant's residual functional capacity

("RFC"), age, education, and work experience.  *Id.* at 1261.

### III.    Background and Procedural History

Ms. Summers was born in 1975.  AR 176.  While under the care of her biological parents,

she was neglected, and physically and sexually abused.  AR 340, 363.[3]  She was placed in foster

care when she was three.  AR 340–41, 363.  She was adopted when she was five.  *Id*.  She

graduated from high school and earned an associate's degree in Occupational Business.  AR 52.

Ms. Summers has three biological children, but protective services removed them from her

custody, and their paternal grandparents adopted them.  AR 56, 352.  She worked several short-

term jobs as a waitress, cashier, and as a caregiver.  AR 276.

Ms. Summers filed applications for Disability Insurance Benefits and Supplemental

Security Income on April 5, 2012, alleging disability beginning January 2, 2012 due to

depression, suicidal ideation, neck/lumbar problems, obesity, and "mental issues."  AR 176–85,

267.  Her claims were denied initially.  AR 102–09.  Ms. Summers requested reconsideration—

stating that her mental problems had worsened, and that she may be schizophrenic and bipolar.

AR 112–17.  Her claims were denied on reconsideration.  AR 118–25.  She requested a hearing

before an administrative law judge ("ALJ"), and ALJ Myriam C. Fernandez Rice held a hearing

on November 13, 2013.  AR 49–69.

The ALJ issued her unfavorable decision on March 28, 2014.  AR 24–41.  At step one,

the ALJ found that Ms. Summers had not engaged in substantial, gainful activity since February

---

[3] Documents 13-1 through 13-20 comprise the sealed Administrative Record ("AR").  When citing to the record, the Court cites to the AR's internal pagination in the lower right-hand corner of each page, rather than to the CM/ECF document number and page.

6, 2012.  AR 29.  Because Ms. Summers had not engaged in substantial, gainful activity for at

least 12 months, the ALJ proceeded to step two.  *Id.*  At step two, the ALJ found that Ms.

Summers suffered from the following severe impairments:  "obesity; displacement of lumbar

intervertebral disc without myelopathy; mild levoscoliosis; depression; and posttraumatic stress

disorder (PTSD)."  *Id.*  At step three, the ALJ found that none of Ms. Summers' impairments—

alone or in combination—met or medically equaled a Listing.  *Id.*  Because none of the

impairments met a Listing, the ALJ assessed Ms. Summers' RFC.  AR 31–40.  The ALJ found

that:

> [C]laimant has the residual functional capacity to perform light work . . . except
> she can never climb ladders, ropes, or scaffolds; she should avoid even moderate
> exposure to hazards such as dangerous moving machinery and unprotected
> heights; she can understand, remember, and execute simple instructions and tasks
> in a work environment that is primarily object-focused; and she can maintain
> concentration, persistence, and pace for two hours at a time before and after
> regularly scheduled breaks in the morning, at lunch, and in the afternoon.

AR 31.  In weighing the medical opinions, the ALJ gave consultative psychologist Dr. Baum's

opinion "little weight."  AR 39.

At step four, the ALJ found that—because Ms. Summers was limited to unskilled work—

she was unable to perform her past relevant semi-skilled work as a retail cashier, cashier, pizza

delivery person, or security guard.  *Id.* at 40.  At step five, the ALJ found that Ms. Summers

could perform other jobs that exist in significant numbers in the national economy.  AR 40–41.

The ALJ found that Ms. Summers was not disabled as defined by the Social Security Act, and

denied Ms. Summers' claims.  AR 41.

On August 13, 2014, the Appeals Council denied Ms. Summers' request for review.  AR 12–15.  Ms. Summers timely filed her appeal to this Court on October 17, 2014.  Doc. 1.[4]

### IV.    Ms. Summers' Claims

Ms. Summers argues on appeal that the ALJ committed three legal errors in assessing the opinions of consultative, examining psychologist Steven K. Baum, Ph.D.:  (1) the ALJ disagreed with Dr. Baum's interpretation of the Minnesota Multiphasic Personality Inventory, Second edition ("MMPI-2") test and substituted her own, lay opinion about the test's validity; (2) the ALJ presumed that Dr. Baum was biased because Ms. Summers' attorney asked him to perform the examination, and he presumably received payment for his work; and (3) the ALJ noted select inconsistencies between Dr. Baum's opinions and other medical evidence, but failed to consider the supportability of Dr. Baum's opinion and its consistency with the record as whole.  *See* Doc. 25 at 16.  Ms. Summers argues that the ALJ applied incorrect legal standards and failed to proffer substantial evidence supporting her decision to give Dr. Baum's opinion "little weight." For the reasons discussed below, the Court agrees.

### V.    Law Governing the Weighing of Medical Source Opinions

An ALJ must consider six factors in deciding what weight to give a medical source opinion:

1. **Examining relationship**:  more weight is given to the opinion of a source who has examined the claimant than to one who has not;
2. **Treatment relationship**:  more weight is given to the opinion of a source who has treated the claimant than to one who has not; more weight is given to the opinion of a source who has treated the claimant for a long time over several visits and who has extensive knowledge about the claimant's impairment(s);

---

[4] A claimant has 60 days to file an appeal.  The 60 days begins running five days after the decision is mailed.  20 C.F.R. §§ 404.981, 416.1481.

3.  **Supportability:**  more weight is given to a medical source opinion which is supported by relevant evidence (such as laboratory findings and medical signs), and to opinions supported by good explanations;
4.  **Consistency:**  the more consistent the opinion is with the record as a whole, the more weight it should be given;
5.  **Specialization**:  more weight is given to the opinion of a specialist giving an opinion in the area of his/her specialty; and
6.  **Other factors:**  any other factors that tend to contradict or support an opinion.

*See* 20 C.F.R. §§ 416.927(c)(1)–(6), 404.1527(c)(1)–(6); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

The ALJ need not explicitly discuss each of the six relevant factors "in deciding what weight to give a medical opinion." *Oldham*, 509 F.3d. at 1258.  "[N]ot every factor for weighing opinion evidence will apply in every case." *Id*. (quoting SSR 06-03p, 2006 WL 2329939, at *5 (S.S.A. Aug. 9, 2006)).  However, "the record must reflect that the ALJ *considered* every factor in the weight calculation." *Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (unpublished).[5]  An ALJ must consider each medical opinion, and if rejecting a medical opinion, the ALJ must "provide specific, legitimate reasons for rejecting it." *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003) (citations omitted).

The ALJ must "make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011) (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir.

---

[5] The Tenth Circuit noted in *Andersen* that "our decision in *Oldham* is entirely consistent with the proposition that, although the ALJ's decision need not include an *explicit discussion* of each factor, the record must permit us to reach the conclusion that the ALJ *considered* all of the factors." *Andersen*, 319 F. App'x at 718 n.2 (emphasis in original).

2003).[6]  The ALJ's discounting or dismissal of an examining medical-source opinion "must be based on an evaluation of all of the factors set out in the cited regulations."  *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012).

## VI.   Analysis

### A.   The ALJ committed legal error by substituting her opinion for that of Dr. Baum concerning the validity of the MMPI-2 testing.

Ms. Summers argues that the ALJ erred by "reinterpreting the results of the MMPI-2 test based on her own lay, psychological opinion."  Doc. 25 at 16.  The Commissioner argues that this error is irrelevant, given the other "well-supported reasons" the ALJ provided for giving Dr. Baum's opinion little weight.  Doc. 28 at 6.  For reasons discussed below, the Court finds that the ALJ committed legal error in substituting her opinion about the validity of the MMPI-2 results for that of Dr. Baum.

An ALJ cannot "interpose his own 'medical expertise' over that of a physician."  *Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987).  The Tenth Circuit has held that an ALJ interposed his own medical expertise over that of a physician in "substitut[ing] his medical judgment for that of [the examining doctor], by determining that the results of the MMPI-2 test were not an adequate basis on which to make a diagnosis."  *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir. 1996).  In *Winfrey*, the ALJ rejected an examining physician's diagnosis, in part

---

[6] Although *Oldham*, *Krauser* and *Andersen* addressed non-controlling treating physicians' opinions, the above requirements apply with equal force to opinions by consultative examiners. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Mounts v. Astrue*, 479 F. App'x 860, 867 (10th Cir. 2012) (unpublished) (applying factors in 20 C.F.R. § 404.1527 to consultative psychologist's opinion).

because the ALJ believed the MMPI-2 was not an adequate basis on which to make the diagnosis. *Id.* at 1022–23.

Here, the ALJ rejected an examining physician's—Dr. Baum's—diagnosis of schizoaffective disorder, bipolar type, with a GAF of 31 because Dr. Baum "based his opinion, at least in part, on MMPI-2 testing despite the invalidity of the profile F score." AR 39. The ALJ did not explain her statement further, but implies that—because the profile F score is invalid— the test itself is invalid. However, as Ms. Summers states, "no one scale stands alone in interpreting the MMPI-2." Doc. 25 at 18 (citing AR 703). There are ten different validity scales in the MMPI-2, which only a trained clinician should interpret.[7] Dr. Baum interpreted the results of the MMPI-2 as "valid and reliable." AR 703. The ALJ rejected Dr. Baum's diagnosis based upon her own interpretation of the MMPI-2 score, which is impermissible under *Winfrey*. As in *Winfrey*, "the ALJ erred in rejecting [the doctor's] opinions without adequate justification and in substituting [her] own medical judgment for that of mental health professionals." *Winfrey*, 92 F.3d at 1023.

In the six-factor analysis for weighing medical source opinions, an MMPI-2 test goes to supportability. *See* 20 C.F.R. §§ 416.927(c)(3), 404.1527(c)(3). The ALJ in this case committed legal error by discrediting the supportability of Dr. Baum's opinion merely because he relied on

---

[7] According to Pearson, the company that produces the MMPI-2, only a trained clinician should interpret the results of the test. http://www.pearsonclinical.com/psychology/products/100000461/minnesota-multiphasic-personality-inventory-2-mmpi-2.html#tab-training (Introduction to MMPI-2). The test includes ten different validity scales to assist the trained clinician in assessing the test's validity: CNS (cannot say), VRIN (variable response inconsistency), TRIN (true response inconsistency), F (infrequency), $F_B$ (back side infrequency), $F_P$ (infrequency-psychopathology), FBS (symptom validity scale), L (lie), K (correction), and S (superlative self-presentation). *Id.* (Interpretation of MMPI-2 Validity Scales). An elevated F scale can indicate either over-reporting, or psychopathology and distress. *Id.*

the MMPI-2 despite the invalidity of the profile F score.  The Commissioner has failed to

demonstrate that this error is harmless.  The ALJ did not discuss any other aspect regarding the

supportability of Dr. Baum's opinion (see discussion below); thus the ALJ's analysis of this

factor is legally erroneous.

**B.   <u>The ALJ applied an incorrect legal standard in discrediting Dr. Baum's
opinion because Ms. Summers' attorney referred her to Dr. Baum, and
because he presumably was paid for his services.</u>**

Ms. Summers argues that the ALJ erred by presuming that Dr. Baum was biased, merely

because her attorney requested the examination.  Doc. 25 at 19.  The Commissioner argues that it

"does not detract from the ALJ's well-reasoned opinion that she noted Plaintiff went to Dr.

Baum solely to obtain an opinion to support her disability claim, rather than to obtain

treatment . . . ."  Doc. 28 at 6.  For the reasons discussed below, the Court finds that the ALJ

committed legal error by giving Dr. Baum's opinion less weight on this basis.

Rejecting a consultative examiner's opinion "on the ground that the opinion was obtained

by [] counsel fails to follow the established legal rules for weighing medical opinions."  *Crowder

v. Colvin*, 561 F. App'x. 740, 743 (10th Cir. 2014) (unpublished) (citing 20 C.F.R. § 416.927(c));

*accord Quintero v. Colvin*, 567 F. App'x 616, 620 (10th Cir. 2014) (unpublished) (citing

*McGoffin v. Barnhart*, 288 F.3d 1248, 1253 (10th Cir. 2002) and *Frey v. Bowen*, 816 F.2d 508,

515 (10th Cir. 1987)).  It is legal error for the ALJ to determine that a "consulting examiner's

opinion is necessarily less trustworthy when it is sought or obtained by the claimant."  *Crowder*,

561 F. App'x at 743.

Here, the ALJ stated in her decision:

[I]t is emphasized that Ms. Summers underwent the examination that formed the
basis of Dr. Baum's opinion not in an attempt to seek treatment for symptoms, but
rather through attorney referral in an effort to generate evidence for her current

appeal.  Further, Dr. Baum was presumably paid for the report.  Although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored.

AR 39.

The Commissioner argues that this language merely points out that Dr. Baum was not a treating physician.  *See* Doc. 28 at 6.  The Court disagrees.  The ALJ discredited Dr. Baum's opinion by emphasizing that it resulted from an "attorney referral" and suggesting that the opinion was purchased.  If the ALJ merely wanted to make clear that Dr. Baum was not a treating physician, the ALJ would have used less pejorative language.  In fact, in the very next paragraph of her opinion, the ALJ states that Dr. Baum "examined Ms. Summers one time and has no treating relationship with her," AR 39, making clear in a neutral manner that Dr. Baum was not a treating physician.  In contrast, the ALJ gave great weight to the agency's consultative examiner Dr. Adams, who similarly was hired to "generate evidence" and presumably was paid.  *See* AR 39.  But as Ms. Summers correctly notes, there is no automatic presumption of bias for the agency's consultative examiner.  Doc. 24 at 19.  Likewise, the law does not permit the ALJ to presume bias merely because the plaintiff hired the consultative examiner.

In the framework of the factors an ALJ must consider when deciding what weight to give a medical opinion, this falls under "other."  *See* 20 C.F.R. §§ 416.927(c)(6), 404.1527(c)(6).  The ALJ committed legal error by giving Dr. Baum's opinion less weight merely because it was "obtained by the claimant."  The Commissioner has failed to demonstrate that this error is harmless.

11

**C.** **The ALJ focused only on select inconsistencies between Dr. Baum's opinions and other medical evidence, but failed to consider the supportability of Dr. Baum's opinion and its consistency with the record as a whole.**

"[T]o the extent there are differences of opinion among the medical sources, the ALJ must explain the basis for adopting one and rejecting another, with reference to the factors governing the evaluation of medical-source opinions." *Reveteriano v. Astrue*, 490 F. App'x 945, 947 (10th Cir. 2012) (unpublished) (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)). As discussed above, the ALJ committed legal error on two factors: supportability and "other." In addition, the ALJ failed to discuss the supportability of Dr. Baum's opinion, and failed to discuss the ways in which Dr. Baum's opinion was consistent with the record as a whole. Instead, the ALJ cherry-picked the portions of the record that supported Dr. Adam's opinion, while failing to adequately discuss or analyze the medical evidence consistent with Dr. Baum's opinion. Although this Court cannot "reweigh the evidence . . . we must assure ourselves that the ALJ gave the relevant material due consideration." *Andersen*, 319 F. App'x at 721 (citations omitted). Here, it is unclear whether the ALJ gave the relevant material due consideration. Therefore, her decision to give Dr. Baum's opinion "little weight" is not supported by substantial evidence.

### 1. Supportability

Ms. Summers argues that the ALJ erred by failing to discuss the supportability of Dr. Baum's opinion. Doc. 25 at 20. The Commissioner admits that an ALJ must consider the degree to which a medical source opinion is "well-supported by medical signs and laboratory findings," Doc. 28 at 4, but fails to explain how the ALJ met this legal requirement. *See* Doc 28 at 4–8.

Supportability is one of the six factors an ALJ must consider in deciding what weight to give a medical opinion. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "The more a medical

source presents relevant evidence to support an opinion, particularly medical signs and

laboratory findings, the more weight we will give that opinion.  The better an explanation a

source provides for an opinion, the more weight we will give that opinion."  20 C.F.R. §§

404.1527(c)(3), 416.927(c)(3).

The ALJ's only analysis of the supportability of Dr. Baum's opinion is her legally

erroneous attempt to discredit it due to Dr. Baum's reliance on the MMPI-2.  The ALJ otherwise

failed to analyze the supportability of Dr. Baum's opinion—including whether his opinion was

supported by medical signs and laboratory findings and the quality of his explanations.

While the ALJ did not discuss the evidence supporting Dr. Baum's opinion, a review of

the record shows that Dr. Baum based his report on independent psychological testing (MMPI-

2), a clinical interview, and a review of most of Ms. Summers' relevant medical records.  AR

702–05.  Dr. Baum reviewed the medical records of consultative examiner Dan Roberts

(1/2/2006); Austin State Hospital records from 2/2012 and 10/2012; ENMU hospital records

from 9/26/12 and 11/21/12; reports from consultative examiner Harry Burger from 12/18/12;

Counseling Associates records from 6/12/2012 through 3/10/2013; consultative psychological

examiner Carl Adams' report from 3/25/13; as well as adult functioning reports and reports from

Social Security examiners.  AR 703–04.

The ALJ also did not discuss the quality of Dr. Baum's explanations for his assessments.

Notably absent from the ALJ's analysis is a discussion of how Dr. Baum's diagnosis of

schizoaffective illness (bipolar type) was consistent with the diagnosis and treatment Ms.

Summers received from Eastern New Mexico University Hospital, consistent with the MMPI-2

pattern, and consistent with Ms. Summers' self-reported symptoms to Counseling Associates.

AR 704.  Additionally, Dr. Baum supported his diagnosis by pointing out that—while

13

Counseling Associates only listed a diagnosis of depression for Ms. Summers—the psychotropic medications they provided are FDA approved to treat bipolarity, not depression. *Id.* Finally, Dr. Baum supported his diagnosis by pointing out that Dr. Adams dismissed Ms. Summers' auditory and visual hallucinations as "illusions," but failed to explain the decline in Ms. Summers' "psychosis" when on "antipsychotic and mood stabilizing medications." AR 704.[8] The ALJ did not adequately analyze or explain her basis for rejecting Dr. Baum's diagnosis and opinion given these supporting facts.

In contrast, the ALJ assigned "great weight" to the opinion of one-time consultative psychological examiner Dr. Carl Adams. AR 39. Dr. Adams performed a clinical interview, but did not perform any of his own psychological testing. AR 598–603. Dr. Adams only reviewed medical records from one provider, Counseling Associates, from August 2012.[9] AR 598. There is no indication in his report that he reviewed any of Ms. Summers' other medical records. *Id.* Ms. Summers told Dr. Adams that her doctors had "not decided whether she is bipolar or may have major depression." *Id.* Dr. Adams noted that "the records from Counseling Associates say she has major depression" and he diagnosed her with major depressive disorder and borderline personality disorder. AR 598, 601.

_____

[8] The ALJ mentioned this fact in her narrative summary of Dr. Baum's opinion, AR 36–37, but did not analyze it—or any of Dr. Baum's other explanations for his assessments—in her analysis and weighing of the medical opinions, AR 38–40.

[9] The Court notes that even if Dr. Adams reviewed all of the treatment records from Counseling Associates—where Ms. Summers received treatment from June 6, 2012 through February 21, 2013—these records do not document anything beyond the initial patient interview. *See* AR 613–22. The treatment notes for each visit appear to be cut-and-paste copies of the first visit, and do little to shed light on changes in Ms. Summers' condition or level of functioning during this period of time.

The Court notes the disparities between the way the ALJ treated the medical opinions of Dr. Baum and Dr. Adams not in an attempt to reweigh the evidence, which is not the purview of this Court, but to show that there are supportability issues that the ALJ failed to adequately address, and which the law requires her to consider.  In failing to discuss any aspects of supportability, the Court cannot be sure that the ALJ considered this factor at all.  Therefore, remand is appropriate.

### 2.  Consistency

Ms. Summers argues that the ALJ failed to consider how Dr. Baum's report was consistent with the record as a whole and instead focused on five minor inconsistencies.  Doc. 25 at 21.  The Commissioner argues that the ALJ provided "sufficient reasons" supported by "substantial evidence" for giving Dr. Baum's opinion little weight.  Doc. 28 at 4.  However, the inconsistencies the ALJ cites do not constitute "substantial evidence" for rejecting Dr. Baum's opinion.

While an ALJ is not required to discuss every piece of evidence, "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996) (citations omitted).  In Ms. Summers' case, there is ample evidence in the record that is consistent with Dr. Baum's diagnosis, which the ALJ failed to adequately discuss or explain why she rejected.  While the ALJ reports much of this evidence in the narrative section of her RFC analysis, *see* AR 32–38, she fails to adequately discuss or analyze the evidence in assigning weight to the medical opinions, *see* AR 38–40.

15

In her analysis of the weighing of the medical opinions, the ALJ cites some inconsistencies between Dr. Baum's opinion and the medical record.  These inconsistencies fall into three groups:  (1) Dr. Baum's diagnosis and GAF scores differed from those of other doctors; (2) Dr. Baum's report differed from Dr. Heneghan's report one month prior; and (3) Ms. Summers told Dr. Adams that she did not feel that her mental or emotional problems were disabling.

In analyzing how Dr. Baum's opinion differed from those of other physicians who had examined or treated Ms. Summers, the ALJ noted:

> During her second hospitalization, it was noted that she was not taking her medication.  At that time, antipsychotic medications were prescribed and she was discharged with a GAF score of 55 and a fair prognosis if she remained compliant with medication.  Dr. Adams, the consultative psychologist, rated her depression as mild to moderate and assigned a GAF score of 65.  Records from Counseling Associates document a diagnosis of a major depressive disorder, moderate, and a GAF score of 55.  Dr. Heneghan diagnosed a major depressive disorder, recurrent, severe, with stable psychosis and assigned a GAF score of 52 and wrote she was fairly stable with current treatment.  Finally, Dr. Baum diagnosed a schizoaffective disorder, bipolar type, and assigned a GAF score of 31.  The preponderance of the medical opinions in Ms. Summers' case supports a diagnosis of depression.  Dr. Baum's opinion differs substantially from those of the other physicians who have treated Ms. Summers.

AR 39.

The ALJ concluded that the record does not support Dr. Baum's diagnosis of "schizoaffective disorder, bipolar type," and that the preponderance of the medical evidence only supports a diagnosis of depression.[10]  *Id.*  Viewed as a whole, the medical evidence shows that

---

[10] The DSM-V defines "schizoaffective disorder" as:

> A. An uninterrupted period of illness during which there is a major mood episode (major depressive or manic) concurrent with Criterion A of schizophrenia.

Ms. Summers had more than depression.  Dr. Baum's diagnosis of schizoaffective disorder

contains depression as a component, but also includes her history of bipolarity and

hallucinations.  In her analysis section of the RFC, AR 38–40, the ALJ failed to discuss evidence

documenting Ms. Summers' diagnoses of bipolarity and hallucinations; evidence that is

consistent with Dr. Baum's diagnosis.  The ALJ did not discuss the fact that Ms. Summers was

diagnosed with "Bipolar Affective, Mixed" disorder by CommUnity Care on March 14, 2012.

AR 393.  The ALJ did not discuss Dr. Baum's assertion that Counseling Associates, while listing

only a diagnosis of a major depressive disorder, prescribed medications to treat bipolarity.  AR

704.  The ALJ did not discuss the fact that, on October 3, 2012, Eastern New Mexico Medical

Center diagnosed Ms. Summers with "bipolar disorder, type I, most recent episode manic with

psychotic features."  AR 578.  The ALJ did not discuss the fact that on October 19, 2012, the

Roswell Family Practice Clinic diagnosed Ms. Summers with "bipolar affective disorder and

schizophrenia, stable."  AR 596.  The ALJ did not discuss the fact that certified nurse

practitioner Seyed-Hassan Nazipour-Caloor diagnosed Ms. Summers with "bipolar disorder" and

---

    B. Delusions or hallucinations for 2 or more weeks in the absence of a major mood episode
       (depressive or manic) during the lifetime duration of the illness.
    C. Symptoms that meet criteria for a major mood disorder are present for the majority of the
       total duration of the active and residual portions of the illness.
    D. The disturbance is not attributable to the effects of a substance (e.g., a drug of abuse, a
       medication) or another medical condition.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 105
(5th ed. 2013).  The Bipolar Type of this disorder "applies if a manic episode is part of the
presentation.  Major depressive episodes may also occur."  *Id*. at 106.  Criterion A of
schizophrenia is defined as the "presence of one (or more) delusions with a duration of one
month or longer."  *Id.* at 90.

PTSD.  AR 677.  The ALJ also did not discuss the fact that Ms. Summers repeatedly reported

audio-visual hallucinations.  AR 58–59, 73, 241, 580, 599, 601, 695.[11]

 The record reflects that Ms. Summers' GAF scores varied significantly over time.  The

ALJ points to Dr. Baum's GAF score of 31 as a reason his opinion was inconsistent with the

record; however, Dr. Baum's score is not inconsistent with the record viewed as a whole.  In her

analysis of the weight given to the various medical opinions, the ALJ left out several GAF

scores, including those which were more consistent with Dr. Baum's:[12] on admittance to the

---

[11] Dr. Baum noted in his report that Dr. Adams "accurately documents the claimant's 25-year
history of auditory and visual hallucinations, but dismisses the well-established criteria (DSM-V)
as illusions, not hallucinations due to their occurrence at times in culture.  He is however at a loss
to explain the decline in psychosis when the claimant receives antipsychotic and mood
stabilizing medications.  Psychotropic medications do not treat illusions—they treat
hallucinations and serious symptoms of mental illness."  AR 704.  While the ALJ mentioned this
in her narrative section, AR 37, the ALJ did not indicate if or why she rejected Dr. Baum's
assertion.

The record shows that Ms. Summers repeatedly reported her auditory and visual hallucinations:
on 12/20/2012 she reported to Eastern New Mexico Medical Center that she had "been hearing
murmurs in her head over the last several weeks and murmurs have slowly been increasing into a
male voice . . . ."  AR 580.  Her chief complaints for that visit were "auditory hallucinations,
disorganization, and manic symptoms."  *Id.*  She reported to Dr. Adams that she "hears voices
mumbling but rarely is able to understand what they say" and that "her mother is in her head."
AR 599.  She also reported to Dr. Adams that she had both "auditory and visual hallucinations."
AR 601.  Dr. Heneghan noted that Ms. Summers reported a "decrease in voices and ability to
ignore voices."  AR 695.

[12] The GAF (Global Assessment of Functioning) scale was dropped from the DSM-V due to its
"lack of clarity" and "questionable psychometrics."  American Psychiatric Association,
Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).  However, the
providers in this case used the GAF system outlined in the DSM-IV.  The GAF is a subjective
determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall
level of functioning."  American Psychiatric Association, Diagnostic and Statistical Manual of
Mental Disorders 32 (4th ed. 2000).  A GAF of 61–70 indicates "mild symptoms" or "some
difficulty in in social, occupational, or school functioning."  *Id.* at 34.  A GAF score of 51–60
indicates "[m]oderate symptoms," such as "a flat affect and circumstantial speech, occasional
panic attacks," or "moderate difficulty in social or occupational functioning."  *Id.*  A GAF score

Austin State Hospital on February 20, 2012, Ms. Summers had a GAF of 20 (AR 351); on

discharge on March 2, 2012, it was 44 (AR 351); on March 14, 2012, CommUnity Care listed

Ms. Summers' GAF as 62 (AR 384); on admittance to Eastern New Mexico Medical Center on

September 27, 2012, Ms. Summers had a GAF of 25 (AR 581); on discharge on October 3, 2012,

it was 55 (AR 581).  Dr. Adams assigned a GAF of 65.  AR 601.[13]  Dr. Baum assigned a GAF of

31.  AR 704.  Dr. Adams' GAF was higher that most of the other scores, but the ALJ did not

discredit his opinion for having an outlying GAF score.  However, the ALJ discredited Dr.

---

of 41–50 indicates "[s]erious symptoms . . . [or] any serious impairment in social, occupational, or school functioning," such as inability to keep a job.  *Id.*  A GAF score of 31–40 indicates "some impairment in reality testing or communication," such as "speech is at times illogical, obscure or irrelevant" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id.*

> In October 2014, SSA issued a revised Administrative Message (AM) on use of GAF scores.  The AM applies to all adjudicators, including ALJs, and still provides that GAF ratings are considered as opinion evidence.  According to revised AM the problems that may arise with the use of GAF scores to evaluate disability include:  1. GAF ratings are not standardized, with the result that SSA "adjudicators cannot draw reliable inferences from differences in GAF ratings assigned by different clinicians or from a single GAF rating.  A GAF rating compares the patient with the distinctive population of patients the clinician has known.  This limits direct comparability of GAF ratings assigned by different evaluators or even by the same evaluator at substantially different points in time."  2. GAF ratings are not designed to predict outcome but rather to "help plan and measure the impact of treatment."  3. GAF ratings need supporting detail.

2 Soc. Sec. Disab. Claims Prac. & Proc. § 22:243 (2nd ed.) (citing AM-13066 REV.).

[13] Several courts have held that where an ALJ relies on GAF scores in the RFC process, the ALJ cannot "cherry pick" high GAF scores while ignoring lower scores which would support a finding of disability.  *See, e.g., Rivera v. Astrue,* 9 F. Supp. 3d 495, 505 (E.D. Pa. 2014) ("ALJ may not 'cherry-pick' higher GAF scores in his analysis and ignore GAF scores that may support a disability."); *Yurt v. Colvin,* 758 F.3d 850, 859 (7th Cir. 2014) (prohibiting "cherry-picking of the medical record" and higher GAF scores); *Carrillo v. Colvin*, 213 Soc. Sec. Rept. Serv. 212, 2015 WL 875672 (N.D. Ill. 2015) (ALJ erred by cherry-picking GAF scores, by failing to consider all the GAF scores in an equal or fair manner or at least offering an explanation for implicit belief that some GAF scores were more reliable than others.)

Baum's opinion for having a low GAF score.  The Commissioner argues that Ms. Summers "points only to general consistencies regarding Plaintiff's diagnoses and a few of the GAF scores, none of which is necessarily probative of the severity and limiting nature of her impairments."  Doc. 28 at 6.  This argument does not address the fact that the ALJ relied on the differences in the GAF scores in discrediting Dr. Baum's opinion.  The records show that Ms. Summers' GAF scores varied considerably, sometimes changing significantly in a short period of time.

The ALJ also gave Dr. Baum's opinion "little weight" because it contradicted the medical opinion of Dr. Heneghan from a month earlier.  Much of the Commissioner's brief on this issue consists of reasons why Dr. Heneghan's opinion was superior to Dr. Baum's.  But the ALJ did not give these reasons.  "[T]his court may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself."  *Haga v. Astrue*, 482 F.3d 1205, 1207–08 (10th Cir. 2007).  What the ALJ stated in her decision is as follows:

> Dr. Heneghan noted she [Ms. Summers] was engaging in hobbies such as beading and crocheting and was getting out of the house more.  She denied any side effects from her medication and felt she was doing well overall.  There was no evidence on his examination of any abnormal or psychotic thoughts and he described her as calm and engaging.  Dr. Baum noted untoward medication side effects, the first such report in the records.

AR 39.  Ms. Summers argues that there is nothing incongruent with Dr. Heneghan's notation that she was getting out of the house more and Dr. Baum's notation that "claimant is able to read, clean house . . . .  She is taken care of by others.  She reports that she prefers to stay in her home all day and is unable to shop or go to crowded places."  Doc. 25 at 23 (citing AR 702).  The Court agrees.  In addition, the only medication side effect Dr. Baum noted was that Ms. Summers did not drive due to her medications.  AR 702.  And contrary to the ALJ's assertion,

Ms. Summers reported medication side effects numerous times before she saw Dr. Baum. *See* AR 55, 240, 250, 291, 304.

The final reason the ALJ gives for assigning Dr. Baum's opinion "little weight" is that Ms. Summers told Dr. Adams  that she "did not feel that her mental or emotional problems were disabling," but then went to see Dr. Heneghan and Dr. Baum.  AR 39.  Although the ALJ makes it sound like Ms. Summers was doctor shopping, Ms. Summers actually saw Dr. Heneghan as a continuation of the nine months of treatment she received from Counseling Associates. Counseling Associates closed in 2013—during the period when many New Mexico behavioral healthcare providers were accused of Medicaid fraud—and was taken over by Turquoise Health and Wellness.  Doc. 25 at 11, AR 51.  Dr. Heneghan worked for Turquoise Health and Wellness. AR 695.  Additionally, Dr. Adams noted in his report that, although Ms. Summers had "good psychological insight," she lacked the ability to "utilize her insight."  AR 599.  Neither the fact that Ms. Summers sought treatment for her ongoing mental health issues from Dr. Heneghan, nor the fact that Ms. Summers' attorney sent her for a consultative exam with Dr. Baum, supports giving Dr. Baum's opinion "little weight."

The ALJ failed to adequately analyze all of the factors for weighing medical opinions, or to show the Court that she did so.  Additionally, the ALJ failed to adequately analyze or discuss all of the evidence in the record for the inconsistencies she discussed.  Therefore, substantial evidence does not support the ALJ's decision to give Dr. Baum's opinion "little weight."

## VI.    Conclusion

The Commissioner must "satisfy us that all of the § 404.1527(d) factors were properly considered and that the apparent rationale for largely disregarding [a medical] opinion[] is sufficient." *Andersen,* 319 F. App'x at 721–22.  The Commissioner has failed to do so.  The ALJ committed legal error by giving Dr. Baum's opinion lesser weight based on her own interpretation of the MMPI-2 scores, and based on the fact that Ms. Summers was referred to Dr. Baum by her attorney.  An ALJ must consider all of the factors in weighing medical opinions, and the factors are not ranked "in terms of importance."  *Andersen*, 319 F. App'x at 718 n.2.  A correct legal analysis of these two factors could result in the ALJ assigning Dr. Baum's opinion a different weight.  Therefore, the error is not harmless, and remand is appropriate.

In addition to legal error, substantial evidence does not support the ALJ's decision to give Dr. Baum's opinion "little weight."  The ALJ's analysis fails to show this Court that she adequately considered all of the evidence, or that she properly considered all six factors in deciding what weight to assign to Dr. Baum's opinion.  I therefore recommend the Court grant plaintiff's Motion to Remand (Doc. 24) to allow the ALJ to reweigh the medical opinions.

I also recommend that the Court grant Ms. Summers' unopposed Motion to Amend/Correct Brief (Statement of Jurisdiction) (Doc. 30).

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(C).  A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

Laura Fashing
United States Magistrate Judge